```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
DANIEL MALARKEY,                     :   08 Civ. 9049 (JCF)
                                     :
                 Plaintiff,          :       MEMORANDUM
                                     :       AND  ORDER
     - against -                     :
                                     :
MICHAEL J. ASTRUE,                   :
Commissioner of Social Security,     :
                                     :
                 Defendant.          :
- - - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE
```

The plaintiff in this action, Daniel Malarkey, seeks review under 42 U.S.C. § 405(g) of a determination by the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance benefits.  Both parties consented to proceed before me for all purposes pursuant to 28 U.S.C. § 636(c), and each has now moved for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure.  In the alternative, the plaintiff requests a remand.

For the reasons set forth below, the decision of the Commissioner is reversed and the case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

Background

     A. Personal History

Daniel Malarkey is forty-seven years old.  (R. at 38).[1]  He

---

[1] "R." refers to the administrative record filed with the Commissioner's answer.

completed an associate degree in electrical technology in 1987. (R. at 101, 360). From 1990 to 2005, Mr. Malarkey worked a variety of jobs, including as an electro-mechanical technician, apartment manager, maintenance worker, taxi driver, night auditor, and construction laborer. (R. at 64). As a night auditor at a hotel from December 2001 to March 2002, the plaintiff sat at a desk, balanced the books, and did "nothing physical." (R. at 129, 362).

For the next three years, Mr. Malarkey was employed as a laborer for a private firm working at the United States Military Academy. (R. at 129). His responsibilities included various construction work, including painting, masonry, and electrical work. (R. at 129, 361). While working on December 6, 2004, Mr. Malarkey slipped on some icy steps and fell on the right side of his buttocks, thereby injuring his right leg, his left knee, lower back, and right buttock. (R. at 253, 361, 368). The accident occurred just before the end of the work season, which did not resume for another "few months." (R. at 361). The plaintiff returned to work in April 2005 only to find that his condition had worsened and that he could not safely perform his construction duties. (R. at 361). Mr. Malarkey reports that he was laid off on May 20, 2005, when he went to his boss about his injury and informed him he would be seeking medical assistance. (R. at 96).

The plaintiff claims that his injury severely limits his physical abilities. He has difficulty staying seated because he

has to change positions frequently.  (R. at 58-59, 374).  He can stand, but not for much longer than fifteen minutes at a time.  (R. at 375).  He can lift a gallon of milk (approximately eight pounds), but cannot stoop to get it.  (R. at 375-76).  In general, he cannot stoop, bend, or crawl.  (R. at 376).

In the summer of 2005, Mr. Malarkey attempted to work again as a taxi driver, only to quit because of discomfort from sitting and his inability to lift heavy luggage into the trunk.  (R. at  56, 367-68).  Since then, he has lived at home without working.  (R. at 358, 361, 367-68).  He has difficulty taking care of his house, especially since his brother -- who had moved in with him to provide assistance -- moved out in November 2007.  (R. at 53, 56, 378).  The plaintiff struggles to perform routine tasks, including maintaining personal hygiene, doing laundry, carrying groceries, and cleaning.  (R. at 54-58, 378).  He spends most of his time at home.  (R. at 54, 57-58).

The plaintiff's injury, however, is not completely debilitating.  Mr. Malarkey has done light exercise in an attempt to rehabilitate himself, including walking on a treadmill.  (R. at 54, 380).  Although it is difficult for the plaintiff to drive longer than ten minutes, he has driven up to thirty miles at a time.  (R. at 56, 379). He drives short distances to the post office and store on a daily basis, and he frequents the library. (R. at 54, 58, 377, 379-80).  He is able to shop for clothes and

necessities.   (R. at 57).

B. Medical History

On January 20, 2005, almost six weeks after his accident, Mr. Malarkey visited the emergency room at Keller Army Hospital at West Point.   (R. at 253).   He was experiencing continuous pain in his right buttock and leg, radiating to his foot, as well as pain and swelling in his left knee.   (R. At 253)   He had no lumbar[2] tenderness, but he did have tenderness in his right sacroiliac joint.[3]   (R. at 253).   His left knee was painful and had some effusion[4] in the medial joint space and postpatellar[5] region.   (R. at 253).   X-rays of his spine, left knee, and right hip were all considered normal.   (R. at 226-28).   Mr. Malarkey was prescribed Mobic and Tramadol.   (R. at 253).

On April 13, 2005, Mr. Malarkey consulted with Dr. Mark S. Pfaff, of Orthopedics & Sports Medicine, PC, about his fall.   (R. at 176-77).   Dr. Pfaff observed that the plaintiff walked with a

---

[2] The lumbar region is "the part of the back and sides between the ribs and the pelvis."  Stedman's Medical Dictionary 1034 (27th ed. 2000) (Stedman's").

[3] The sacroiliac joint connects the sacrum, the "triangular spinal bone below the lumbar vertebrae," and each ilium, "the largest of the bones that form the outer walls of the pelvis." The American Medical Association Encyclopedia of Medicine 878 (Charles B. Clayman ed., Random House 1989).

[4] Effusion is "the escape of fluid from the blood vessels or lymphatics into the tissues or a cavity."  Stedman's at 570.

[5] The postpatellar area refers to the region behind the patella, or kneecap.  See Stedman's at 1331, 1430.

minimally antalgic gait[6] but did not use assistive devices for walking.  (R. at 177).  Dr. Pfaff did not find any evidence of radicular symptoms[7] or instability but did note tenderness and swelling in the left knee as well as mild pain from right hip rotation and tenderness in his right posterior gluteal region.  (R. at 177).  The doctor's diagnoses were a right hip contusion[8] and a left knee medial meniscus tear.[9]   (R. at 177).   Dr. Pfaff recommended that Mr. Malarkey take Motrin and offered a doctor's note for light-duty work, but the plaintiff declined, explaining that for financial reasons he only wanted full-duty work.  (R. at 177).   The doctor also noted that the plaintiff suffered from depression.  (R. at 177).

Mr. Malarkey had another appointment with Dr. Pfaff on June 3, 2005, during which his symptoms seemed to have worsened.  (R. at 174).   Again, he walked with a mildly antalgic gait but with no assistive devices.  (R. at 174).   His lumbar spinal motion was restricted on all planes, and he experienced some tenderness in his

---

[6] An antalgic gait is "a characteristic . . . resulting from pain on weightbearing in which the stance phase of [gait] is shortened on the affected side."  Stedman's at 722.

[7] Radicular symptoms pertain to the nerves or their roots. See Stedman's at 1502.

[8] A contusion is defined as "[a]ny mechanical injury (usually caused by a blow) resulting in hemorrhage beneath unbroken skin." Stedman's at 406.

[9] The meniscus is a "crescent-shaped fibrocartilaginous structure of the knee."  Stedman's at 1091.

paraspinal[10] and posterior right gluteal regions which radiated to his right thigh.  (R. at 174).  Raising his leg into a straight position elicited pain in his posterior gluteal region.  (R. at 174).  Dr. Pfaff's diagnoses this time were that Mr. Malarkey had sciatica,[11] hip pain, and a left knee medial meniscus tear.  (R. at 174).  Dr. Pfaff suggested physical therapy as well as an MRI scan of the left knee.  (R. at 174-75).  However, Mr. Malarkey explained that he could afford neither, having been denied Workers' Compensation benefits.  (R. at 174).

Despite his continued inability to attend physical therapy, Mr. Malarkey returned twice in August to see Dr. Pfaff.  (R. at 172-73, 209).  The doctor's findings and recommendations remained essentially the same.  (R. at 172-73, 209).  However, during a visit on August 17, 2005, the plaintiff described thoughts of suicide.  (R. at 209).  Because of his suicidal ideations and financial inability to comply with treatment recommendations, Dr. Pfaff discharged Mr. Malarkey from his practice and referred him to another provider.  (R. at 209).

On September 6, 2005, Mr. Malarkey met with Dr. Victor Khabie, an orthopedic surgeon at Somers Orthopedic Surgery and Sports

---

[10] The paraspinal region is the area along the spinal cord. See Stedman's at 1308, 1671.

[11] Sciatica is defined as "[p]ain in the lower back and hip radiating down the back of the thigh into the leg."  Stedman's at 1602.

Medicine Group.  (R. at 249).  Dr. Khabie noted that Mr. Malarkey
walked with a "severely" antalgic gait, this time using a cane.
(R. at 249).  Mr. Malarkey explained to Dr. Khabie that he had been
placed on moderate disability.  (R. at 249).  He complained of pain
in the right hip, lumbar region and left knee.  (R. at 249).  The
lumbar spine area was tender and his left knee had restriction of
motion, but x-rays showed no abnormalities.  (R. at 250).  Dr.
Khabie concluded that Mr. Malarkey was suffering from lumbar disc
herniation,[12] right hip internal derangement,[13] a possible
osteochondral lesion,[14] and a left knee medial meniscus tear.  (R.
at 250).  The doctor classified the plaintiff as "moderately
disabled," and stated that Mr. Malarkey was unable to be employed
in any type of labor involving lifting, climbing, stooping, or
bending.  (R. at 250).  Dr. Khabie did indicate, however, that it
would be "reasonable" for Mr. Malarkey to drive a taxi.  (R. at
250).

On Dr. Khabie's order, Mr. Malarkey had MRI examinations on

---

[12] A herniated disc, or disk prolapse, is "[a] common, painful
disorder in which an intervertebral disk ruptures and part of its
pulpy core protrudes."  The American Medical Association
Encyclopedia of Medicine at 364, 535.

[13] Derangement is simply "[a] disturbance of the regular order
or arrangement."  Stedman's at 478.

[14] An osteochondral lesion is a "pathologic or traumatic
discontinuity of tissue or loss of function" of the bone or
cartilage.  See Dorland's Illustrated Medical Dictionary 1039, 1366
(31st ed. 2007)("Dorland's").

October 24, 2005.  (R. at 152-154).  The MRI of his lumbar spine revealed disc desiccation,[15] but no herniation or spinal stenosis.[16] (R. at 154).  Additionally, an MRI of his left knee revealed a complex multi-directional medial meniscus tear as well as a "high signal" in the medial meniscus and capsule.  (R. at 152).  An MRI of the right hip was normal.  (R. at 153).

During a follow-up visit in November, Dr. Khabie noted that the MRI revealed a torn left meniscus, and he recommended physiotherapy as well as arthroscopic knee surgery.[17]  (R. at 248). Dr. Khabie discussed the surgery with Mr. Malarkey who, at the time, appeared willing to proceed.  (R. at 248).  They planned to schedule the surgery once it was authorized by the Workers' Compensation Board.  (R. at 248).  On the Workers' Compensation billing form for the MRI, Dr. Khabie checked the boxes on the form indicating that Mr. Malarkey was totally disabled from his regular duties.  (R. at 193).

Mr. Malarkey saw another orthopedist, Dr. Yair Rubinstein, on January 30, 2006, for a second opinion.  (R. at 245).  Dr. Rubinstein noted that Mr. Malarkey did not appear to be in acute

---

[15] Desiccation is the process of dehydration, or drying.  See Stedman's at 483.

[16] Spinal stenosis is the "narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine." Dorland's at 1795.

[17] An arthroscopy is an "[e]ndoscopic examination of the interior of a joint."  Stedman's at 151.

distress, but he walked with a mildly antalgic gait and reported persistent pain.  (R. at 245).  In addition, the doctor documented that Mr. Malarkey's left knee showed mild effusion but no significant swelling, although it was tender in three different areas.  (R. at 245).  The doctor's overall impression was that Mr. Malarkey had a left medial meniscus tear and chondromalacia[18] in the patella with hypermobility.[19]  (R. at 245).  Like Dr. Khabie, Dr. Rubinstein discussed arthroscopic surgery with the plaintiff, but Mr. Malarkey expressed a desire to undergo physical therapy first. (R. at 246).  Dr. Rubinstein referred him to physical therapy for his knee and prescribed Naprosyn.  (R. at 246).  Although the doctor thought it was reasonable for Mr. Malarkey to first try physical therapy, he stated, "This does not look like a repairable tear on the MRI."  (R. at 246).

A month later, Mr. Malarkey had another visit with Dr. Rubinstein.  (R. at 244).  This time, Mr. Malarkey reported that he was attending physical therapy and that his knee was feeling much better.  (R. at 244).  He said that taping the knee was helpful and asked Dr. Rubinstein to prescribe a brace, which he did.  (R. at 244).  Although Mr. Malarkey's condition had improved, Dr. Rubinstein still anticipated surgery if the knee deteriorated

---

[18] Chondromalacia is the softening of cartilage.  Stedman's at 341.

[19] Hypermobility is the "[i]ncreased range of movement of joints."  Stedman's at 851.

again.   (R. At 244).   Dr. Rubinstein indicated on a Workers' Compensation billing form for this appointment that Mr. Malarkey was still totally disabled from regular work.   (R. at 194).

Mr. Malarkey continued to visit Dr. Rubinstein over the next several months on average once a month.   (R. at 304-11).   During this time, Mr. Malarkey reported increasing pain in his right hip, often radiating to his lower extremities.   (R. at 305-11). Although physical therapy did appear to be relieving his knee pain, it did not help the plaintiff's hip.   (R. at 310).   Dr. Rubinstein then began to administer cortisone injections into the hip.   (R. at 309).   The injections minimized Mr. Malarkey's hip pain but not the pain radiating down his right leg, leading the doctor to suspect a radiculopathic[20] problem that would call for an orthopedic spine consultation.   (R. at 308).   Thus, Dr. Rubinstein referred the plaintiff to Dr. Barry Krosser in the same practice.   (R. at 307-08).

Mr. Malarkey met with Dr. Krosser on May 9, 2006.   (R. at 307).   The doctor concluded that Mr. Malarkey indeed had lumbar radiculopathy and recommended a lumbar steroid injection.   (R. at 307).   The doctor discussed this with the plaintiff and made a plan to request authorization for coverage of the injections by a pain management doctor.   (R. at 307).

_____

[20] Radiculopathic refers to a "disorder of the spinal nerve roots."   Stedman's at 1503.

10

On May 25, 2006, the plaintiff sought treatment from St. Luke's Cornwall Hospital. (R. at 159). The treating physician noted that Mr. Malarkey had hip and knee pain, with pain in his right leg radiating to his foot. (R. at 159). The plaintiff received a cortisone injection to the right hip but stated he did not want a spinal injection. (R. at 159). He also obtained a prescription for Lidocaine patches. (R. at 162).

Mr. Malarkey returned to Dr. Rubinstein the following week with several questions. (R. at 306). During the visit he indicated that he had not yet decided whether to have a spinal injection. (R. at 306). He also reported new pain in his right knee, which he believed to be related to his previous injury. (R. at 306). He asked the doctor for knee tape and pain medication. (R. at 306). Dr. Rubinstein refused to authorize narcotic painkillers and instead prescribed Naprosyn. (R. at 239).

Following this appointment, Mr. Malarkey saw Dr. Rubinstein twice more. On July 18, 2006, he complained of continued pain in his right hip that still radiated down his leg. (R. at 238). Dr. Rubinstein diagnosed trochanteric bursitis[21] and/or lumbar radiculopathy. (R. at 238). At that time, Mr. Malarkey still refused to undergo the recommended lumbar injection, and Dr.

---

[21] Trochanteric bursitis is the inflamation of "a closed sac or envelope lined with synovial membrane and containing fluid" over "one of the bony prominences" near the "upper extremity of the femur." See Stedman's at 259, 262, 1878.

Rubinstein noted that there was little else he could do.  (R. at 305).  The doctor recommended that the plaintiff continue his exercises and take anti-inflammatories to manage his pain.  (R. at 238).  In their final appointment on September 8, 2006, Mr. Malarkey asked for narcotic pain medication, but Dr. Rubenstein refused.  (R. at 304).  He reviewed the recommendation for a lumbar epidural injection again with Mr. Malarkey and directed him to come back on an "as needed" basis.  (R. at 304).

During that summer, Mr. Malarkey resumed treatment with Dr. Khabie.  (R. at 247).  He was again using a cane and reported significant pain in his left knee and lumbar area of his back, which was spasming.  (R. at 247).  Because the plaintiff refused knee surgery as well as epidural injections, Dr. Khabie recommended more physical therapy for treatment.  (R. at 247).  He indicated that he would continue to see Mr. Malarkey on an "as needed" basis.  (R. at 247).

Mr. Malarkey then underwent several assessments performed by outside evaluators for the New York State Office of Temporary Disability Assistance Division of Disability Determinations for Workers' Compensation purposes.  On July 25, 2006, he met with Dr. Paul G. Kleinman, an orthopedic surgeon, who served as an independent medical examiner.  (R. at 197-202).  Dr. Kleinman conducted a physical examination, during which he observed mild limping, tenderness in the right hip, numbness to the touch in the

12

right lateral thigh and leg, and a reduced range of motion in the left knee. (R. at 198). He also reviewed the MRI reports and all of the chart notes from the claimant's treating doctors since his fall at work in December 2004. (R. at 197-98). He determined that Mr. Malarkey had chronic low back syndrome, a left knee meniscus tear, and right knee pain from overuse. (R. at 198). The doctor reported to the Division of Disability Determinations that he did not know "when, if ever," Mr. Malarkey could return to restricted or modified work duty and classified him as totally disabled. (R. at 198, 201).

Approximately a month later, at the instruction of the Division of Disability Determination, Mr. Malarkey met with Dr. Steven Calvino, a consultative orthopedic examiner. (R. at 231-33). Dr. Calvino's examination consisted of the claimant's self-reporting and one physical examination. (R. at 231-33). The doctor noted that the Mr. Malarkey's current medications were Naproxen and Lidoderm patches. (R. at 231). He observed that the plaintiff used a cane during the entire examination, though Dr. Calvino did not believe it was medically necessary. (R. at 232). The doctor recorded that Mr. Malarkey experienced mild difficulty walking and squatting due to pain but could get on and off the examination table without assistance and could rise from his chair without difficulty. (R. at 232). Dr. Calvino also observed that Mr. Malarkey had a full range of motion in his knees, hips, and

13

ankles, as well as full flexion and rotary movements in his back. (R. at 232-33). The doctor noted no spasms or tenderenss. (R. at 232-33). Dr. Calvino concluded that "there are no restrictions for this claimant." (R. 233). However, he did conclude that Mr. Malarkey suffered from a lumbar strain injury and chronic right hip and bilateral knee pain. (R. at 233).

In November 2006, the Division of Disability Determinations had Dr. Donna White, an orthopedic medical consultant, review the impressions of Dr. Calvino and Dr. Kleinman. (R. at 142). Dr. White opined, based on these reports and from what appears to be a previous review of some other medical records, that the claimant still suffered from meniscal damage in his left knee. (R. at 142). She also concluded that over the course of an eight-hour work day, Mr. Malarkey could sit about six hours and stand or walk for at least two hours. (R. at 142). She determined he could occasionally lift or carry objects up to ten pounds in weight. (R. at 142). She concluded, however, that he could not climb ladders, ropes, or scaffolds, nor could he kneel or crawl. (R. at 142).

From September 2006 through April 2007, Mr. Malarkey with Dr. Khabie on almost a monthly basis. (R. at 273-75, 286-87, 289). He continued to walk with a cane and reported persistent pain in his left knee and lower back, although he said the physical therapy helped. (R. at 273-75, 286-87, 289). Mr. Malarkey again refused spinal injections of cortisone and repeatedly declined to go

14

forward with knee surgery.  (R. at 273, 287, 298).  Dr. Khabie's
impression remained that the plaintiff had a medial miniscus tear
in his left knee.  (R. at 273-75, 286-89).  At one point in April,
Mr. Malarkey also complained of crepitus[22] in his left knee.  (R.
at 286).  Dr. Khabie consistently advised Mr. Malarkey to undergo
arthroscopic surgery on his left knee, but the plaintiff continued
to refuse.  (R. At 273, 275, 287, 289).  Instead, he requested pain
medication; so, Dr. Khabie referred him to Dr. Nicholas Panaro, a
psychiatrist and pain management specialist at his practice.  (R.
at 273).

Following Dr. Khabie's referral, Mr. Malarkey met with Dr.
Panaro in October and November, 2006.  (R. at 290-91, 293).  In the
initial appointment, he requested painkillers, but Dr. Panaro
refused to prescribe them without finding an acute source for the
pain.  (R. at 293).  He diagnosed Mr. Malarkey with a lumbar strain
and also noted that Mr. Malarkey ambulated with a cane for "unknown
reasons."  (R. at 293).  During the second appointment, Dr. Panaro
conducted nerve testing on the plaintiff.  (R. at 290, 293).  The
EMG[23] tests showed no evidence of any severe radiculopathy, but they

---

[22] Crepitus is the grating of a joint.  Stedman's at 424.

[23] The term EMG is an abbreviation for an electromyogram, which
tests electrical activity in muscles to determine "whether nerve or
muscle disorders are present."  The American Medical Association
Encyclopedia of Medicine at 399.

did indicate a mild sensory neuropathy.[24]  (R. at 290).  Dr. Panaro stated that he could not "advocate [Mr. Malarkey's] total disability," but stated that Mr. Malarkey had a moderate, partial disability for Workers' Compensation purposes.  (R. at 291).  He also opined that Mr. Malarkey "may require disability through [a] psychiatrist for other reasons" and recommended a clinic to treat depression.  (R. at 291).

Dr. Khabie filled out a Medical Source Statement of Ability to do Work-Related Activities ("Medical Source Statement") for Mr. Malarkey on January 15, 2007.[25]  (R. at 269-72).  According to that report, Dr. Khabie believed that the plaintiff could occasionally lift or carry ten pounds and frequently lift or carry less than ten pounds during an eight-hour workday.  (R. at 269).  Furthermore, he indicated that during a typical workday, Mr. Malarkey could stand or walk for at least two hours, sit for no more than six, and had to alternate between sitting and standing.  (R. at 269-70). Finally, Dr. Khabie noted that the plaintiff had limited push/pull ability in the lower extremities, and could not crawl, kneel, crouch, or climb ramps or stairs.  (R. at 270).  On August 14,

---

[24] Neuropathy is defined as "[d]isease, inflammation, or damage to the peripheral nerves, which connect the central nervous system, or CNS (brain and spinal cord), to the sense organs, including muscles."  The American Medical Association Encyclopedia of Medicine at 723.

[25] The signature on the Medical Source Statement is illegible, but the Administrative Law Judge determined the author to be Dr. Khabie.  (R. at 21).

2007, Dr. Khabie completed another Medical Source Statement and recorded identical conclusions.  (R. At 321-24).

Throughout 2007, Mr. Malarkey continued to see Dr. Khabie. (R. at 286-87, 289, 320, 325).  In January 2007, Dr. Khabie started the plaintiff on a home exercise program after he was discharged from formal physiotherapy because therapy had been helpful in reducing his knee pain.  (R. at 289).  Still, he also gave Mr. Malarkey a prescription for a wheeled walker and for Ultram.  (R. at 286).  On August 13, 2007, when he again saw Dr. Khabie, the plaintiff requested to return to physical therapy for his knee pain.  (R. at 325).  In addition to prescribing this, Dr. Khabie gave him Percocet and offered him another pain management session with Dr. Panaro which the plaintiff refused, explaining that "he has someone that he goes to."  (R. at 325).

On September 24, 2007, Mr. Malarkey met with Dr. Khabie and reported that the physical therapy had not been helpful.  (R. at 320).  Ultimately, the plaintiff decided to proceed with arthroscopic surgery.  (R. at 320).  Dr. Khabie planned for the knee surgery to go forward once approval was granted from the Workers' Compensation Board.  (R. at 320).  Dr. Khabie concluded that Mr. Malarkey could only do "very light office work . . . where he could sit or stand at leisure" but was unable to do work requiring walking, standing, climbing, or heavy lifting.  (R. at 320).

The final medical record for Mr. Malarkey is dated January 15, 2008, when he underwent a psychiatric examination by Dr. Jeffrey Rubin, a psychologist for the Social Security Administration. (R. at 314-18). Dr. Rubin noted that the plaintiff had been taking Naproxen, Lidoderm, Percocet, Meloxicam, Tramadol, and Oxycodone. (R. at 314). Mr. Malarkey also openly admitted to the doctor that he had alcoholism with periods of sobriety. (R. at 314-15). The psychiatrist made no other diagnosis of mental illness and found that the plaintiff had no limitation on his ability to understand, remember, and carry out simple and complex instructions. (R. at 315-18). The doctor also reported that Mr. Malarkey was capable of making complex work-related decisions. (R. at 317).

Throughout his treatment and during the proceedings before the Administrative Law Judge, Mr. Malarkey was forthcoming about his alcoholism. (R. at 376). Mr. Malarkey admitted his drinking problem to his first orthopedic physician, Dr. Pfaff. (R. at 176). And, during his initial appointment with Dr. Khabie, on September 6, 2005, the doctor noted that Mr. Malarkey "drinks alcohol daily." (R. at 249). Likewise, Dr. Rubinstein reported that "[t]here does appear to be some issue with alcohol abuse. He has been drinking a fair number of beers every night." (R. at 304). Both of the independent examiners, Dr. Kleinman and Dr. Calvino, recorded Mr. Malarkey's history of alcohol abuse. (R. at 198, 231-32). Dr. Calvino noted that "the claimant does get some relief [from] the

pain by drinking a six-pack of beer daily" and that he was slurring his speech during the examination.  (R. at 231-32).

C. Prior Proceedings

Mr. Malarkey applied to the Social Security Administration for disability insurance benefits ("DIB") on July 3, 2006.  (R. at 23). After his application was denied on November 17, 2006, the plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (R. at 29, 34).  On March 3, 2008, ALJ Brian W. Lemoine held a video hearing, at which Mr. Malarkey and a vocational expert, Donald Slive, testified.  (R. at 15, 353).

1. The Vocational Expert's Testimony

In response to a hypothetical posed by the ALJ, Mr. Slive testified that an individual of Mr. Malarkey's age, education, and work history would be able to perform a night auditor's job that permitted him to alternate between sitting and standing at least five minutes at a time.  (R. at 383).  The ALJ then asked Mr. Slive if an individual who had the same characteristics but was limited to sedentary, instead of light work, would be employable.  (R. at 383-84).  Mr. Slive testified that such an individual would still be capable of performing the duties of a night auditor.  (R. at 384).  Finally, in response to the ALJ's question about what jobs were available if the same individual "was unable to consistently complete an eight-hour workday due to pain," Mr. Slive stated that he could not identify any jobs in the national or regional economy

19

that such a person could perform.  (R. at 384).

Mr. Malarkey's attorney then questioned Mr. Slive.  She asked about the employment opportunities for an individual with Mr. Malarkey's age, education, and work experience whose limitations were essentially those described by Dr. Khabie in his Medical Source Statements of January 15, 2007 and August 14, 2007.[26]  (R. at 384-85).  Mr. Slive's response was ambiguous.  He initially said that because a typical workday includes two 15-minute breaks and a 30-minute meal break, and because it is generally acceptable for an individual to be up to ten percent "off task," the hypothetical individual could perform the night auditor's job.  (R. at 385). But Mr. Slive later testified that if the person were limited to less than six hours of sitting during the workday, he could not do a night auditor's job.  (R. at 385-86).  Instead, Mr. Slive said he could perform the job of a "surveillance systems monitor."  (R. at 385-86).  Mr. Slive's conclusion was based on the assumption that the person could work an eight-hour day.  (R. at 386).  Mr. Slive

---

[26] The limitations that plaintiff's counsel provided were: (1) "the person could occasionally lift and carry ten pounds" and frequently lift and carry less than ten pounds; (2) "standing and walking is limited to two hours of an eight-hour workday;" (3) sitting and standing must be periodically alternated; (4) "sitting is limited to less than six hours of an eight-hour workday;" and (5) balancing and stooping is permitted occasionally, while climbing, kneeling, and crawling are prohibited.  (R. at 384).  I note that plaintiff counsel's characterization of the second limitation is not supported by the evaluations of Dr. Khabie, or Dr. White, who both recorded that Mr. Malarkey could stand or walk for "at least 2 hours" of an eight-hour day.  (R. at 269, 321, 142).

then noted that if that person "could not work a normal eight-hour day," he would not be qualified for any jobs in the national or local economy.  (R. at 386-87).

On March 19, 2008, ALJ Lemoine denied Mr. Malarkey's claim. (R. at 12-22).  Mr. Malarkey applied for review by the Appeals Council, but his appeal was denied on September 11, 2008.  (R. at 6-8).  The plaintiff filed this action on October 15, 2008.

D. Determining Disability

A claimant is disabled under the Social Security Act and therefore entitled to benefits if he can demonstrate that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The disability must be of "such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

To determine whether an individual is entitled to disability benefits, the Commissioner of Social Security employs a five-step sequential analysis.  20 C.F.R. § 404.1520(a); Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (citing Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)).  First, the claimant must

demonstrate that he is not currently engaged in a substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(I), (b).  Next, he must prove that he has a severe impairment that "significantly limits [his] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  Third, if the impairment is listed in 20 C.F.R. § 404, Subpt. P, App. 1, or is the substantial equivalent of a listed impairment, the claimant is automatically considered disabled.  20 C.F.R. § 404.1520(d). However, if the claimant's impairment is neither listed nor equal to any listed impairment, he must prove that he does not have the residual functional capacity to perform his past work.  20 C.F.R. § 404.1520(e).

Finally, if the claimant satisfies his burden of proof on the first four steps, the burden shifts to the Commissioner to show that there is alternative substantial gainful employment in the national economy that the claimant can perform.  20 C.F.R. § 404.1520(g); Shaw v. Chater, 221 F.3d 126, 131-32 (2d Cir. 2000).

E. The ALJ's Decision

The ALJ followed this five-step analysis to assess Mr. Malarkey's disability.  (R. at 16-17).  Under the first step, the ALJ found that Mr. Malarkey was not engaged in substantial gainful activity.  (R. at 17).  The ALJ also found that Mr. Malarkey had "severe" impairments, meeting the second requirement for disability.  (R. at 17).  Specifically, he found the plaintiff's

22

severe impairments to include a tear of the left medial meniscus and L2-L3 disc desiccation with low back pain.  (R. at 17).

However, under the third step of the analysis, the ALJ determined that Mr. Malarkey's impairments were not listed in 20 C.F.R. § 404, Subpt. P, App. 1, nor did they medically equal any of the listed impairments.  (R. at 18).  He considered the plaintiff's back pain in comparison to the category "Musculoskeletal Impairments."  (R. at 18).  This impairment requires "specific anatomical deformities and/or neurological findings resulting in the inability to ambulate effectively on a sustained basis."  (R. at 18).  After a review of the record, the ALJ determined that Mr. Malarkey's impairments did not rise to this level.  (R. at 18).

The ALJ found that Mr. Malarkey retained a residual functional capacity to perform light work with some movement restrictions.  (R. at 18-21).  In reaching this conclusion, the ALJ employed a two-step analysis.  (R. at 18-19).  First, he determined whether the impairments could reasonably be expected to produce Mr. Malarkey's symptoms.  (R. at 18-19).  Second, he determined the extent to which the symptoms limited the plaintiff's ability to perform basic work activities.  (R. at 19).

A review of the medical record led the ALJ to conclude that Mr. Malarkey's impairments could reasonably be expected to produce his pain or other symptoms.  (R. at 19-20).  However, the ALJ did not find credible Mr. Malarkey's claim that the symptoms limited

his ability to do basic work activities.  (R. at 20).  In reaching that conclusion, the ALJ relied on a number of factors.  (R. at 20).  First, he noted that Mr. Malarkey has neither received treatment for his condition nor taken pain medication since February 2007, when Workers' Compensation terminated his treatment and benefits.  (R. at 20).  He also noted that the plaintiff had declined certain recommended treatment, initially refusing physical therapy and then refusing arthroscopic knee surgery and steroid injections to his back.  (R. at 20).  Next, the ALJ observed that the plaintiff did not display discomfort sitting during the hearing although he walked very slowly with a cane.  (R. at 20).  Additionally, the ALJ took note of Mr. Malarkey's independence and self-sufficiency in living alone without auxiliary care.  (R. at 20).  Most significantly, the ALJ was not persuaded by a review of the medical record.  (R. at 20-21).  The ALJ concluded that there was "no diagnostic or objective evidence" of disc herniation or nerve problems in the plaintiff's back.  (R. at 20-21).  He observed that the MRI of Mr. Malarkey's hip was normal and the pain in his hip improved after cortisone injections.  (R. at 20).  The ALJ further noted the conclusions of some doctors that Mr. Malarkey's cane was unnecessary, as well as several doctors' statements that he was capable of performing light work.  (R. at 20-21).  In particular, the ALJ noted inconsistencies in Dr. Khabie's diagnoses.  He explained that in September 2005, Dr.

Khabie concluded that Mr. Malarkey could drive a taxicab, and in September 2007, Dr. Khabie said Mr. Malarkey was capable of "light office work," but in his January 2007 Medical Source Statement, the doctor determined that the plaintiff was precluded from "performing a full range of sedentary work." (R. at 21). The ALJ determined that Dr. Khabie's "severely restrictive assessment" as well as Dr. Kleinman's finding that Mr. Malarkey was "totally disabled" were not persuasive. (R. at 21). As a result, the ALJ decided that Mr. Malarkey retained a residual functional capacity to do limited light work. (R. at 18).

The ALJ then concluded that Mr. Malarkey was capable of performing his previous job as a night auditor. (R. at 21). Because the ALJ determined that Mr. Malarkey was qualified to perform this job, he found he was not disabled without reaching the issue of whether Mr. Malarkey was capable of performing other jobs. (R. at 17, 21-22). The ALJ thus denied Mr. Malarkey's claim for DIB. (R. at 22).

F.   Standard of Review

Review of a social security disability determination involves two levels of inquiry. First, the court reviews the Commissioner's decision to determine whether the correct legal standard was applied. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998). Second, the court determines whether the decision was supported by substantial

evidence.  <u>Tejada</u>, 167 F.3d at 773; <u>Balsamo</u>, 142 F.3d at 79.
Substantial evidence in this context is "'more than a mere
scintilla.  It means such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion.'" <u>Richardson v.</u>
<u>Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co.</u>
<u>v. National Labor Relations Board</u>, 305 U.S. 197, 229 (1938)).
Courts must be mindful of the fact that the Social Security Act
"'is a remedial statute which must be liberally applied.'" <u>Vargas</u>
<u>v. Sullivan</u>, 898 F.2d 293, 296 (2d Cir. 1990) (quoting <u>Rivera v.</u>
<u>Schweiker</u>, 717 F.2d 719, 723 (2d Cir. 1983)); <u>accord</u> <u>Pagan ex rel.</u>
<u>Pagan v. Chater</u>, 923 F. Supp. 547, 550 (S.D.N.Y. 1996).

<u>Discussion</u>

The plaintiff maintains that the ALJ's determination must be
overturned because (1) he failed to properly evaluate the medical
opinions in the record, (2) substituted his own judgment for that
of a duly-qualified medical expert, and (3) did not adequately
develop the record.  (Plaintiff's Memorandum of Law in Support of
His Motion for Judgment on the Administrative Record and Pleadings
Pursuant to 12(c) F.R.C.P. ("Pl. Memo.") at 10).

A.   <u>Treating Physician Rule</u>

The opinion of a claimant's treating physician regarding the
"nature and severity" of his impairments will be given "controlling
weight" if it is "well-supported by medically acceptable clinical
and laboratory diagnostic techniques and is not inconsistent with

the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); Green-Younger, 335 F.3d at 106. If the Commissioner determines that a treating physician's opinion is not controlling, he is nevertheless required to consider other factors in determining the weight to be given to that opinion. 20 C.F.R. § 404.1527(d)(2). These factors include: (1) the length and frequency of the treatment relationship, (2) the nature and extent of the relationship, (3) the degree of evidence provided to support the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion is from a specialist, and (6) other factors brought to the Commissioner's attention tending to support or contradict the treating physician's opinion. 20 C.F.R. §§ 404.1527(d)(2)-(6); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004).

The Commissioner must provide the claimant with "good reasons" both for why a treating physician's opinion is not being credited and for the weight ultimately given to that physician's opinion. See Holloran, 362 F.3d at 32-33 (remanding case because, although treating physician rule was applied, "good reasons" for weight given treating source's opinion were not provided); Snell v. Apfel, 177 F.3d 128, 133-34 (2d Cir. 1999) ("[T]he Social Security Administration is required to explain the weight it gives to the opinions of a treating physician."). "The requirement of reason-giving exists, in part, to let claimants understand the disposition

of their cases, even -- and perhaps especially -- when those dispositions are unfavorable." Snell, 177 F.3d at 134.  If the ALJ fails to provide good reasons for his decision, a district court may remand the case.  Halloran, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."); Snell, 177 F.3d at 133 ("Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand."); Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) (finding that failure to provide "good reasons" for affording "no weight" to treating physician's opinion is legal error).

The treating physician rule is particularly useful in a case such as this where the plaintiff saw several doctors and the medical evidence does not easily lead to a disability determination.  However, the ALJ instead appeared to pick and choose between medical evidence with no indication that he contemplated giving controlling weight to the doctors who treated Mr. Malarkey.[27]  In fact, the ALJ, without explanation, disregarded

---

[27] The Commissioner contends that the ALJ applied the treating physician rule to Dr. Khabie's January 2007 and August 2007 Medical Source Statements.  He notes that the ALJ evaluated multiple reports by Dr. Khabie, referred to him as a "treating source," heard Mr. Malarkey confirm at the hearing that he had been seeing

the opinion of Dr. White, whom New York's Division of Disability Determinations asked to evaluate Mr. Malarkey's residual functional capacity, merely because it contradicted the conclusion of Dr. Calvino, the "consulting examiner."   (R. at 21, 142, 231-33). Significantly, Dr. White's November 2006 assessment of Mr. Malarkey's capacity to lift, carry, stand, walk, and sit was identical to Dr. Khabie's Medical Source Statements from January and August 2007.  (R. at 142, 269-72, 321-24).   Moreover, Dr. Calvino's determination appears not to have been based on any evaluation of Mr. Malarkey's medical records.  (R. at 231-33). Rather, it seems that Dr. Calvino's conclusion that Mr. Malarkey had "no restrictions" was based only on his own physical examination of Mr. Malarkey and the plaintiff's self-reporting, without regard to the documented medical history.  (R. at 231-33).

Finally, the ALJ discriminated among Dr. Khabie's evaluations -- choosing to rely on his September 2005 and September 2007 conclusions -- which the ALJ deemed supportive of the determination that Mr. Malarkey was not disabled -- while discounting his Medical Source Statement from January 2007 and not even mentioning the one from August 2007.  (R. at 21).  "Such an inconsistent use of the

---

Dr. Khabie for three years, "considered the supportability and consistency" of Dr. Khabie's assessments, and knew that Dr. Khabie was a specialist. (Memorandum of Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings and in Support of the Commissioner's Motion for Judgment on the Pleadings at 23-24). But there is no indication from these references that the ALJ acted with the thoroughness required by the treating physician rule.

medical evidence undermines any argument that [the treating physician's] opinion was so unreliable that it should not have been assigned controlling weight." Shaw, 221 F.3d at 135. Rejecting the opinions of treating physicians solely on the basis of internal inconsistencies is error. See Balsamo, 142 F.3d at 80.

In the instant case, the ALJ neglected to provide "good reasons" for his failure to give controlling weight to Dr. Khabie's opinion, as required by the treating physician rule. Snell, 177 F.3d at 133. The ALJ simply deemed the physician's January 2007 Medical Source Statement "inconsistent with his own clinicals and his other opinions." (R. at 21). Such a conclusory statement, without further explanation, fails to satisfy the demands of the treating physician rule. Although, as noted above, the consistency of a treating physician's opinion is one of the factors to be considered in determining the weight to give that opinion, the regulations instruct the judge to consider the consistency between the treating physician's conclusions and "the record as a whole." See 20 C.F.R. §§ 404.1527(d)(4); 416.927(d)(4); Flores v. Astrue, No. 08 Civ. 2810, 2009 WL 1562854, at *17 (S.D.N.Y. May 27, 2009). Here, the ALJ referenced the apparent internal inconsistency between Dr. Khabie's various reports. However, Dr. Khabie's January 2007 assessment is by no means inconsistent with the record as a whole, including the opinions of Drs. Kleinman and White, both independent medical examiners. (R. at 21, 142, 197-201).

Furthermore, as discussed below, when confronted with inconsistent conclusions from a treating physician, the ALJ had an obligation to request clarification from the physician and should not have simply dismissed his findings.

Thus, the ALJ erred in not properly applying the treating physician rule to Mr. Malarkey's case.

B.   Duty to Develop the Record

Because of the non-adversarial nature of a disability benefits hearing, the ALJ has an affirmative obligation to develop the administrative record.  Echevarria v. Secretary of Health & Human Services, 685 F.2d 751, 755 (2d Cir. 1982); see also 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. § 404.1512(d)-(e). This duty exists even when the claimant is represented by counsel.  Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996).

Here, the ALJ determined that Dr. Kleinman's opinion that Mr. Malarkey was "totally disabled" and Dr. Khabie's "severely restrictive assessment" from January 2007 were "not persuasive." (R. at 21).  The only explanation given for this disregard by the ALJ was an observation of "inconsistencies."  (R. at 21).  By dismissing Dr. Khabie's January 2007 assessment without requesting further explanation into these inconsistencies, the ALJ violated his duty to develop the record.

"[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out

more information from the treating physician and to develop the administrative record accordingly." <u>Hartnett v. Apfel</u>, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998); <u>accord</u> <u>Clark v. Commissioner of Social Security</u>, 143 F.3d 115, 177-18 (2d Cir. 1998) (remanding because ALJ appeared to violate duty to develop record by not seeking clarifying information from treating physician to explain inconsistencies in his two reports and instead relying on the inconsistencies to deny benefits); <u>Schaal</u>, 134 F.3d at 505 ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] <u>sua sponte</u>."); 20 C.F.R. § 404.1512(e)(1).

The ALJ in this case made no effort to have Dr. Khabie explain the perceived inconsistencies between his January 2007 Medical Source Statement and his "clinicals and other opinions," including his September 2005 assessment that Mr. Malarkey could drive a taxicab and his September 2007 note that Mr. Malarkey could perform "very light office work . . . where he could sit or stand at leisure." (R. at 21, 250, 320). It is not at all obvious that the assessment in Dr. Khabie's Medical Source Statement is inconsistent with these other reports. First, the change in his opinion about Mr. Malarkey's employment capabilities between September 2005 and January 2007 may be the result of a decline in Mr. Malarkey's condition, about which Mr. Malarkey testified. (R. at 368-69). Second, it is not apparent that the Medical Source Statement's

assessment of Mr. Malarkey's mobility contradicts the September 2007 note.

Furthermore, while the January 2007 Medical Source Statement was portrayed by Mr. Malarkey's counsel during his hearing as restricting him to under eight hours of work per day (R. at 386-87), its terms are ambiguous. By limiting Mr. Malarkey to "less than about 6 hours" of sitting and "at least 2 hours" of standing or walking, it is conceivable that Dr. Khabie believed Mr. Malarkey was capable of performing eight hours of work per day. (R. at 269-70). Or, conversely, Dr. Khabie may have meant, by indicating that Mr. Malarkey had these limitations, he could not perform eight hours of daily work.

In view of this seeming confusion, the ALJ should have taken steps to have Dr. Khabie clarify his evaluations of Mr. Malarkey. See Rosa v. Callahan, 168 F.3d 72, 79-80 (2d Cir. 1999) (determining that the ALJ "committed legal error" by failing to request supplemental information from treating physicians when faced with gaps in record); 20 C.F.R. § 404.1512(e)(1). In Rosa, the Second Circuit noted, "It is entirely possible that [the treating physician], if asked, could have provided a sufficient explanation for any seeming lack of support for his ultimate diagnosis." 168 F.3d at 80 (citations omitted). It is "entirely possible" that Dr. Khabie could have provided "a sufficient explanation" for any contradictions perceived by the ALJ. See id.

Finally, the ALJ's portrayal of Dr. Khabie's January 2007 Medical Source Statement as an outlier is undermined by the doctor's August 14, 2007 Medical Source Statement, in which he marked off the same limitations as he did in January 2007. (R. at 321-24). The ALJ's decision made no mention of this report, an omission that contributes significantly to the grounds for remand. See Snell, 177 F.3d at 134 (accepting Appeals Council's decision to favor one report of treating physician over another, but remanding case due, in part, to its complete omission of reference to third examination by same doctor). While the ALJ may have a sufficient reason for disregarding the August 2007 Medical Source Statement, Mr. Malarkey is "entitled to an express recognition" of the existence of an additional consistent statement by his treating doctor; and, if the ALJ does not credit this additional statement, he is entitled to an explanation why not. See id.

By dismissing Dr. Khabie's evaluations as inconsistent instead of seeking clarification, the ALJ thus failed to develop the record.

C.   Remedy

Under 42 U.S.C. § 405(g), the district court has the power to affirm, modify, or reverse the ALJ's decision with or without remanding the case for a rehearing. The plaintiff argues that the case should be remanded for a calculation of benefits or, alternatively, for further evidentiary proceedings. (Pl. Memo. at

19-20, 22). Remand for additional fact development is appropriate

where "'there are gaps in the administrative record or the ALJ has

applied an improper legal standard.'" Rosa, 168 F.3d at 82-83

(quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)); see also

Halloran, 362 F.3d at 33. Alternatively, when a court finds "no

apparent basis to conclude that a more complete record might

support the Commissioner's decision," remand for a calculation of

benefits may be warranted. Rosa, 168 F.3d at 83.

In this case, remand for further fact development is the most

appropriate remedy. See Schaal, 134 F.3d at 505. On the basis of

the record, I am not in the position to determine whether Mr.

Malarkey is entitled to benefits or for what period. Instead, the

ALJ should make such a determination after proper application of

the treating physician rule and additional development of the

record as he sees fit.[28]

---

[28] Upon remand, it will be appropriate to address more
thoroughly certain aspects of the record. Specifically, the ALJ
relied on the factual finding that the plaintiff "ha[d] received
essentially no treatment or taken any medication since February
2007." (R. at 20). However, as the ALJ noted in his decision, the
denial of Mr. Malarkey's Workers' Compensation claim meant that he
could not afford medication or knee surgery. (R. at 20, 320, 370-
71). The record also reveals that Mr. Malarkey was prescribed the
pain medication Ultram on April 17, 2007 (R. at 286) and given
Percocet on August 13, 2007. (R. at 325). Mr. Malarkey's
testimony is unclear as to whether he took Percocet after February
2007. (R. at 370-71). The ALJ's conclusion that the plaintiff sat
through the hearing "with no visible discomfort" and "lacked the
general physical appearance of a person who might have been
experiencing prolonged or severe pain" is also troubling. (R. at
20). First, the hearing was conducted via videoconference, thus
compromising the ability of the ALJ to judge Mr. Malarkey's

35

Case 1:08-cv-09049-JCF Document 20 Filed 10/20/09 Page 36 of 36

For the reasons set forth above, the Commissioner's decision denying the plaintiff benefits is vacated and the case is remanded for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of Court shall enter judgment accordingly and close the case.

SO ORDERED.

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          October 20, 2009

Copies mailed this date to:

Victor Fusco, Esq.
Fusco, Brandenstein & Rada, P.C.
180 Froehlich Farm Boulevard
Woodbury, New York 11797

Susan Branagan, Esq.
Assistant United States Attorney
86 Chambers Street
New York, New York 10007

---

condition. (R. at 355-56). Second, the ALJ's decision omitted mention of the plaintiff's testimony that he was uncomfortable while sitting through the hearing. (R. at 374). Although the ALJ was free to find Mr. Malarkey's statements not credible, he must set forth the reasons for that finding "with sufficient specificity to permit intelligible plenary review of the record." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988).